# THE STATE v. JASPER WEBB, Appellant.

**Division Two, January 6, 1914.**

1. **COURTS: Jurisdiction: Concurrent: Circuit Judge Trying Criminal Case in Jackson County.** Sec. 4221, R. S. 1909, provides that the judge of division 7 of the circuit court of Jackson county shall, upon proper notice, open and hold division 2 of the criminal court, but not until the conclusion of the case which may then be on trial before him in said circuit court; and where he has so opened the criminal division he is not deprived of jurisdiction in a criminal case because, while waiting for the parties to make their challenges to the jurors, he finished a case in the circuit court, and did some routine work of the circuit court during the trial of the criminal case, and presided as judge of the juvenile court while the jury in the criminal case were considering their verdict, being present, however, during the whole time actually spent in the trial of the criminal case.

2. **INFORMATION: Variance: Alleging Place of Wound: Head Instead of Body.** The fact that the mortal wound was in the head instead of in the body was a mere matter of variance between the allegation and the proof which is cured by Sec. 5114, R. S. 1909, and by the Statute of Jeofails (R. S. 1909, sec. 5115).

3. **————: ————: Automatic Pistol.** The fact that the pistol with which accused inflicted the mortal wound was an automatic, and not a revolver as alleged in the information, is a matter of variance, cured by Sec. 5114, R. S. 1909, and by the Statute of Jeofails (R. S. 1909, sec. 5115).

4. **JURIES: Prejudice: Appeal.** It is the duty of the court to see that a conviction shall not stand which is the result of prejudice on the part of the jury.

5. **————: ————: Offer of Prejudicial Evidence.** The mere offer of prejudicial evidence which is excluded on objection, is not reversible error.

6. **REMARKS OF COUNSEL: Murder: Death Penalty: Repeatedly Offering Improper Evidence.** In a prosecution for first degree murder, by shooting, to which there was a plea of self-defense, the prosecutor on cross-examination asked defendant about cutting another person at another time, an objection was sustained and the court said, "No defense for such a question." Prosecutor also asked another witness, "Don't you know he (defendant) had trouble with countless men down

State v. Webb.

there?" and an objection was sustained to that question. After defendant's evidence was closed the State brought about eighty men into the court room as witnesses in rebuttal. After six of them had testified as to defendant's bad reputation, the court, on objection, declined to hear any more witnesses on that point and the others were not put on the stand. In his argument prosecutor said, "We brought them here by the score and put them on to tell you what kind of man this man was, and we put them on until they stopped us." On objection the remark was withdrawn. Again, the prosecutor in his argument spoke of defendant's wife having fled from him because he carried a revolver, when there was no evidence to that effect, and upon objection the remark was withdrawn and the jury told not to consider it. Also, in closing, he expressed his solemn belief in defendant's guilt and asked them to place upon him the burden of his conviction. On objection, he withdrew that statement too, and the jury were instructed not to consider it. The verdict of the jury assessed the death penalty. *Held*, reversed and remanded for misconduct of counsel prejudicial to defendant.

Appeal from Jackson Criminal Court.—*Hon. E. E. Porterfield*, Judge.

REVERSED AND REMANDED.

*Boyle & Howell* and *Joseph S. Brooks* for appellant.

(1) (a) The criminal court of Jackson county, division 2, and the circuit court of Jackson county, division 7, are wholly separate and distinct courts, each having its own separate and distinct organization, officers and record. The jurisdiction of the two courts is entirely different. Ins. Co. v. Shattuck, 159 Ill. 616, 57 Ill. App. 382; State ex rel. v. Fort, 210 Mo. 512. (b) Courts are political entities established under the law for governmental purposes, and in contemplation of law, have a separate existence from the judges who preside over them, and while the court continues open, the judge is part of the court, and cannot leave that court and engage in judicial duties in another court of which he is ex-officio judge. Ins. Co.

v. Shattuck, 159 Ill. 610. (c) The temporary relinquishment of control of the court wherein a cause for felony is on trial, and engaging in other official or judicial duties, by the judge, is such an act as to disorganize the court so far as that case is concerned. (d) The absence of the judge from the court, engaged in other judicial duties for three days in the trial of a criminal prosecution for murder in the first degree, is error and fatal to a conviction, and especially so, where the judge is engaged in trying a cause in another separate and distinct court of which he is also the judge. Meredith v. People, 84 Ill. 479; State v. Benerman, 59 Kan. 586. (e) The judge is an essential part of the court, and his absence in another court as judge of that court destroys for the time being the existence of the tribunal he had vacated. Turbeville v. State, 56 Miss. 793; People v. Eckert, 16 Cal. 111. (f) When the judge of division two of the criminal court resumed the trial of the case of Lombardo v. Insurance Company in the circuit court, there no longer remained a judge of the tribunal in which the prisoner was being tried. He abdicated his functions as judge of the criminal court when he resumed the trial of the unfinished cause in the circuit court. Ins. Co. v. Shattuck, 159 Ill. 610; Horne v. Rodgers, 49 L. R. A. 180; Smith v. Sherwood, 95 Wis. 588; Meredith v. People, 84 Ill. 479; O'Brien v. People, 17 Colo. 561; Shular v. State, 105 Ind. 289; Ellerbee v. State, 41 L. R. A. (Miss.) 569; State v. Smith, 49 Conn. 378. (g) The judge of division 7 of the circuit court during the trial of the case at bar also opened the juvenile court during the trial of the case at bar, and tried divers causes in that court. By so doing he abandoned his functions as judge of the criminal court, the juvenile court and the criminal court being separate and distinct courts. Cases cited supra. (h) A court once regularly convened continues open till actually adjourned. People v. Central Bank, 55 Barb. 412; La-

bodie v. Dean, 47 Tex. 90. (i) Other cases covering
the point are: Ex parte Williams, 69 Ark. 457; Bat-
ten v. State, 80 Ind. 394; Grable v. State, 2 Green
(Miss.) 559; In re Millington, 24 Kan. 214; Tippy v.
State, 35 Neb. 368; McNeill v. McDuffie, 119 N. C. 336;
Wilson v. State, 37 Tex. Cr. 373; Thompson v. Peo-
ple, 144 Ill. 378. (j) In criminal prosecutions for
felonies consent to the absence of the judge cannot be
given, and if given, it will not be binding upon the
accused and omission to object at the time will not
prejudice or affect his right to raise the point even on
appeal. State v. Claulias, 1 Mo. App. 551; Brownlee
v. Hewitt, 1 Mo. App. 360; Ellerbee v. State, 41 L.
R. A. 373. (2) (a) It was highly reprehensible for
the State's attorney in his closing argument to the
jury to state that he believed the defendant was guilty
of murder. The personal belief of the prosecutor is
not a ground for conviction. State v. Hess, 240 Mo.
160; State v. Baker, 246 Mo. 376. (b) The language
of the assistant prosecuting attorney to the effect that
the jury saw the people who came to court and told
the jury what they thought about him down there,
and also in telling the jury that the kind of man who
kills is the man whose wife flees from him on account
of his having a revolver in his possession, was gross
misconduct on the part of the counsel for the State.
State v. Fisher, 124 Mo. 464; State v. Jackson, 95 Mo.
623; State v. Bobbst, 131 Mo. 338; State v. Ulrich,
110 Mo. 350; State v. Furgerson, 152 Mo. 99. (c)
The court erred in refusing to grant defendant a new
trial on account of misconduct of counsel for the State
in the argument of the cause to the jury. (3) The
court erred in refusing to discharge the jury on mo-
tion of defendant after the State had caused nearly
one hundred persons to be brought into the court and
arrayed before the court and jury to be sworn as
witnesses in rebuttal. The affidavits of jurors that

254 Mo. 27

they were influenced by this array of persons as if for witnesses, is competent on motion for new trial.

*John T. Barker,* Attorney-General, and *Ernest A. Green,* Assistant Attorney-General, for the State.

(1) In Chafee & Co. v. Rainey, 21 S. C. 11, it was held that a judge may render a decree in a cause heard before him in one circuit after he has entered upon the duties of another term in another circuit. Oliver v. Town, 24 Wis. 512; Christie v. Whitten, 69 Ga. 765; State v. Pope, 110 Mo. App. 520; Smurr v. State, 105 Ind. 125; Railroad v. Power, 119 Ind. 269; Wadham v. Hotchkiss, 80 Ill. 437; Cahill v. People, 106 Ill. 621; Bank v. Parsons, 45 W. Va. 688. In the case In re Dosett, 2 Okla. 369, substantially the same point was raised on *habeas corpus* by one convicted of murder as in the case at bar. However, the Supreme Court of Oklahoma held that notwithstanding the Payne county court was theoretically in session during the same period that the petitioner was tried for murder, in Logan county, yet such session of court was not such as the law contemplates in the observance of the rule that two courts cannot be in session at the same time. State v. Montgomery, 8 Kan. 358. A circuit judge has an absolute authority to hold circuits in any part of the State, and it is not an objection that circuits both on the law and equity side are held at the same time in the same circuit. Childs v. Bank, 7 Cow. (N. Y.) 513; Bank v. Collins, 76 Ky. 138; Greene v. People, 182 Ill. 278; Naffzioger v. Reed, 98 Mo. 87; State v. Wear, 145 Mo. 203; State v. Baker, 246 Mo. 357. The record shows Judge Porterfield to have been personally present and presiding in division two of the criminal court of Jackson county during each and every step taken in the trial of this case. Therefore there is no merit whatever in appellant's assignment of error in that regard, and the cases cited thereunder are not in point, as all of them are cases wherein the

presiding judge had temporarily vacated the bench and was not present during some of the proceedings. That is not this case. State v. Gardner, 33 Ore. 149. The minor discrepancies in the record referred to in appellant's brief have all been rectified by a stipulation of the parties filed herein. The record as thus amended by stipulation shows the manner by which this cause was transferred to division two of the criminal court of Jackson county, and it also shows as thus amended that Judge Porterfield was personally present during all steps taken in the trial of this cause. (2) Complaint is made in the appellant's brief as to certain remarks made by the prosecuting officers in their arguments to the jury. In each instance the remarks objected to were withdrawn by the prosecuting attorney. Furthermore, the court reprimanded counsel, and then instructed the jury to disregard the remark of counsel. There was no request made by the defendant's counsel in any instance for a further reprimand of the prosecuting attorneys, nor was any exception taken by defendant's counsel to the failure of the court to rebuke the prosecuting attorney. In State v. Chenault, 212 Mo. 137, this court, speaking through BURGESS, J., said: "This point must fail the defendant, as the record does not show that defendant either asked the court to rebuke the prosecuting attorney for any improper remarks made by him, or excepted to the court's action in failing to do so. [Champagne v. Hamey, 189 Mo. 709; State v. Valle, 196 Mo. 29; Estes v. Railroad, 111 Mo. App. 1; State v. McCarver, 194 Mo. 717.]" State v. Valle, 196 Mo. 29; State v. McCarver, 194 Mo. 717; Champagne v. Hamey, 189 Mo. 709. From the above cited decisions it is apparent that the defendant has not properly preserved this point and therefore the same is not before this court for review. Even were this point properly before this court, we do not believe that reversible error was committed in any of the remarks made by the

prosecuting officers. Interfering with counsel in his argument is discretionary with the trial court, and the appellate court will not review such discretion unless it appears that the rights of the prisoner were actually prejudiced. State v. Hamilton, 55 Mo. 520; State v. Hibler, 149 Mo. 484; State v. Allen, 45 W. Va. 65; Inman v. State, 72 Ga. 269; Combs v. State, 75 Ind. 215; Ford v. State, 34 Ark. 649; State v. Turner, 36 S. C. 534. Courts are loath to reverse judgments on account of improper remarks of attorneys—especially as in this case, where the proof is clear, because in such cases a verdict of guilty would have been returned regardless of the improper remarks. State v. Dietz, 235 Mo. 332; State v. Harvey, 214 Mo. 403; State v. Church, 199 Mo. 605; State v. Hibler, 149 Mo. 478; State v. Summar, 143 Mo. 220; State v. Dusenberg, 112 Mo. 277; Sec. 5115, R. S. 1909; State v. Emory, 79 Mo. 463. As a general rule, the withdrawal of the objectionable remarks of the prosecuting attorney, either by himself or by the court, or a direction to disregard them, is deemed to have removed the prejudice and cured the error. State v. Gartrell, 171 Mo. 489; State v. McMullin, 170 Mo. 608; State v. Wright, 141 Mo. 333; State v. Hack, 118 Mo. 92; State v. Gibbs, 10 Mont. 213; Dunlap v. United States, 165 U. S. 486; People v. Benham, 160 N. Y. 402. The jurors in this case heard the objection of appellant to the remarks made. They heard the instant reproof of the court, followed by the withdrawal of the remarks by the prosecuting attorney. Such action surely eradicated any wrong impression that could have been given. Even if this point was subject to review, as it is not, we do not deem it of any merit.

ROY, C.—The information in this case is for murder in the first degree, and charges the defendant with having shot and killed Archie Whitwell on October 11, 1911. It is alleged that the

**Murder.**

weapon was a revolving pistol, and that a mortal wound was inflicted upon the body of said Whitwell. The jury convicted defendant and fixed his punishment at death. The defendant at the time of the killing was about thirty-one years of age, married and had three children, and owned a small farm on which he lived near Oak Grove. The deceased was a young man about twenty-one years of age, of slender build and taller than the defendant. He had lived in the same neighborhood about eight or ten years.

John Webb, defendant's father, owned considerable land adjoining the farm of defendant, but had retired from the farm, leasing a portion of it to another son, Sam Webb, and a portion to Mr. James B. Snider. Sam Russell owned a farm adjoining the farms of defendant and his father. A small creek ran through Russell's land, cutting off a small part next to the Webb land. Russell had a bridge across the creek for his own convenience. Sometime in October, 1910, Jesse Land and John Russell, a son of Sam, were husking corn in the Russell field beyond the bridge from the Webb land. Archie Whitwell with a shotgun came to them from the direction of the Webb land, but not from the direction of the bridge. He told them he had been hunting over on John Webb's land, and that defendant had ordered him off, and that he had told defendant to come down to the bridge and settle it; then looking up, he said "there he is now," and started towards the bridge with his gun. Defendant was then at or near the bridge. After Whitwell had gone about twenty yards, and when he was about seventy yards from defendant, the defendant shot at Whitwell with the gun. Whitwell said, "You little son-of-a-bitch, shoot a man." Defendant walked away and Whitwell went back to where the men were at work. One of them said to him, "Why didn't you shoot him," and he answered, "I don't want to shoot anybody." A shot had struck Whitwell

in the hand and another in his knee. Defendant, immediately after the shooting, went to Independence, where he met Mr. Robinson, a deputy sheriff, and told him that he was in trouble, that he had told a boy who was hunting to keep off his place, and that the boy had teased him, and that on that day he had caught the boy on his place and had been teased by him and had shot him, but said he didn't know how much he was hurt. Robinson advised him to go back home and not consult a lawyer unless he should be arrested, and he did so.

About the 30th of September, 1911, there was a horse show in Oak Grove. The defendant and Whitwell met there. One of them abused the other and threatened to ''get him yet.'' The State's witnesses testified that the defendant was the wrongdoer and that Whitwell told him that he didn't want to have any trouble with him. The defendant's witnesses testified that Whitwell was the aggressor, and that defendant told him that he didn't want to have any trouble with him.

On Wednesday, the 11th of October, thereafter, the defendant was in search of a heifer that had strayed away. He engaged Mr. James Snyder to help him get her. He went to his home and got a different horse from the one he had been riding and put harness on it and procured a rope. He rode the horse thus harnessed, in company with Mr. Snyder, to the lot of his brother, Sam Webb, where the heifer was. He stated that his purpose was to rope the heifer and tie her to the harness and thus lead her home. The animal jumped over the gate and escaped into a neighbor's pasture. Defendant and Snyder then went to see about buying some hogs. Mr. Snyder testified that the defendant said when the heifer escaped that he would ''beef her'' on the following Saturday. The defendant started home and when he got within about a hundred yards of his home, at a point where the

road was bordered with low brush and of irregular windings and somewhat hilly, he met Whitwell and Claude Elliott, a second cousin of Whitwell. They were about thirty yards apart when they became aware of each other's presence. All were on horseback.

Elliott testified that just as they saw the defendant, Whitwell's horse went quickly to the front a few feet and stopped. The defendant pulled off his right glove, and threw it on the side of the road, got off his horse, made a few steps forward, drew his gun and said, "God damn you, I will fix you right here." He fired one shot. Whitwell said, "Oh, don't do that, man, what do you mean?" Defendant then walked a few steps and shot again. Whitwell fell from his horse, and the defendant came up towards where he was lying in the road, and fired three more shots at a distance of about seven feet, and then looked at the witness and said: "You see that, don't you." Defendant then went to his house, and after a few minutes started on his harnessed horse towards Independence. After going a short distance, he left his horse with Mr. Hill, and proceeded on Mr. Hill's horse.

The defendant used an automatic pistol. Immediately afterwards, a shell was picked up about twenty-six feet from where Whitwell's body had lain, and another at a distance of about twenty feet. Other shells were picked up in close proximity to where the body lay. One bullet was dug out of the ground about a foot from the pool of blood indicating where Whitwell's head was lying; it had gone about three inches deep almost perpendicularly. Another bullet was found lying where the body lay. There was a wound in the right hand, one in the right arm, one in the groin. There was a bullet hole just behind the top of the ear and one on the opposite side of the head, about an inch and a half higher up. The doctor who examined him said that the wound in the head was a mortal one, and that he did not examine the one

in the groin. A pocket knife was found shut in Whitwell's pocket, but he had no other weapon of any kind.

On his way to Independence, the defendant was met by Mr. Montgomery, a deputy marshal of Jackson county, and was placed under arrest. The officer testified that, when asked why he had shot deceased, defendant said that it was over an old grudge. John Gregg testified that he had a conversation with defendant in the jail in which witness said, "What was the trouble with you and Archie? I thought that was all over." To which defendant answered, "No, this would have come up at the Oak Grove horse show if it hadn't been for causing an excitement."

The defendant testified that for several years, by direction of his father, he had posted his father's lands against hunters, and had also posted his own. He had a large fish pond or lake in the valley between his house and creek, frequented at times by ducks; that in the spring of 1910 he found Whitwell hunting on the Webb land and called his attention to the fact that the land was posted and requested him to not hunt on the land; that Whitwell said to him, "You damned son-of-a-bitch, if you will get down off of that horse I will whip hell out of you." That at the time of the first shooting in October, 1910, he saw Whitwell slipping in to shoot ducks on the lake; that the ducks flew up and went to the creek or slough. Whitwell got to the slough ahead of him and shot a duck and crossed over the slough and over the creek, placing the creek between them. That he passed down the creek and called across to Whitwell, saying, "I see you have been here hunting on my land again, you oughtn't to do that," and Whitwell answered, "Well, by God, I gave you a damned good cussing last spring and you didn't do anything; you son-of-a-bitch, come on down to the bridge here and we will fight it out," and defendant said "All right." Defendant had fur-

ther to go around to the bridge than Whitwell had; that when Whitwell got within about sixty yards, defendant said to him, "Lay your gun down," to which Whitwell answered, "Not by a damn sight," and raised his gun up, and the defendant then shot him and then turned around and went home. He testified that in the spring of 1911, he met Whitwell in the road, and concerning that meeting he testified as follows: "I didn't hardly recognize who it was until I drove up to him, I was not thinking about him, and when I got up close to him he stepped right out in front of my horse and he says, 'I reckon by God we will settle that shot.' I says, 'Archie, I don't want any trouble with you.' He says, 'Hell you don't.' I says, 'No, I don't.' I says, 'I am a married man and got a wife and three little children and I don't want to be fussing around. I don't bother anybody and I don't want you to impose on me and I want you to let me alone.' Finally then he stepped out of the way in front of the horse and I drove on by." As to the incident at the horse show, as follows: "He says, 'You damned son-of-a-bitch, come around behind the store here and we will settle this;' and I says, 'No, I don't want any trouble with you.' And he says, 'Well, you damned cowardly bastard, for two cents I would ram your head through that glass.' And Howell says, 'Why don't you come on and get him on the road some time.' He says, 'Well, damn him, I can't get him out of his buggy.' "

He testified that his purpose in having the pistol on the day of the killing was to shoot the heifer if he could not catch her and drag her home. His account of the tragedy was as follows: "I got about thirty yards of them and then when I looked up I saw it was Whitwell and Elliott—

"Q. (Interrupting) Who?

"A. Whitwell and Elliott, and just as quick as I saw who it was and kinda threw my leg back over the horse, I noticed Whitwell, he rushed his horse up

a ways and then he got off, jumped off, and as he got off he says, 'Now, God damn you, I will fix you.' He says, 'You son-of-a-bitch, I will kill you right here,' and when I got off he made a rush at me and when I saw him get off I jumped off of my horse and as I jumped off I drew this glove off (indicating) and grabbed my gun like that (indicating). When I hit the ground I never moved out of my tracks but stood right there and when he started towards me I shot him.

"Q. Why did you shoot him? A. Because I was afraid he would kill me."

Defendant's wife testified that she saw the encounter and in substance confirmed defendant's statement of it. On cross-examination she testified as to some trouble between her and her husband, which was afterwards stricken out by the court. There was no evidence that she fled at any time from the defendant.

On cross-examination of defendant, the following occurred:

"Q. Is that the reason why you never had any trouble with him or any fight, was because you didn't want trouble with anybody? A. Yes, sir.

"Q. Why did you have that idea in mind and that reason, or did you have that idea that you didn't want any trouble with anybody, in mind when you cut Arthur Pigg?

"Mr. Boyle: I absolutely object to that—A. (Interrupting) Do you think I will stand up and let a man beat me in the face and not cut him?

"Mr. Boyle: I want to object to that and ask your Honor to instruct the jury that that was improper cross-examination.

"Mr. Jacobs: Just a moment about that matter.

"Mr. Boyle: If we are going to have a discussion, let's have it fairly.

"Mr. Jacobs: Just a moment.

"The Court: The question is altogether thoroughly improper. No defense for such a question as

that. The question will be, the objection to the question will be sustained and the jury instructed that the question is highly improper, highly improper."

Ben Prock, who married a sister of defendant's wife, testified for defendant, and on his cross-examination, the following occurred:

"Q. Now, don't you know that your brother-in-law was not frightened at Archie Whitwell? A. No, sir, I don't know it.

"Q. Don't you know he had trouble with countless men down there, and that— Mr. Boyle (interrupting): I object to that, and I say it is error to indicate a thing of that kind before the jury, and I object to it, and I ask your Honor to instruct the jury that this is improper conduct.

"The Court: I will sustain the objection."

After the defendant's evidence was closed, counsel for the State caused eighty or more witnesses from the vicinity of Oak Grove to be called into the court room and sworn as witnesses in rebuttal. About six of them testified to the defendant's bad reputation as to morals. Other witnesses were offered by the State on the same point, and on objection of the defendant, the court ruled that no more would be heard. Thereupon, counsel for the defendant requested the court to discharge the jury because such a large array of witnesses had been brought into the court room to prejudice the mind of the jury. Counsel for the State, knowing it would not be possible to use any considerable number of them, the following occurred:

"Mr. Jacobs: Now, with reference to that, it comes at a queer time. There was no objection made at the time, and for the further reason that the State evidenced its willingness to use all the witnesses it had but was stopped by objection of the defendant from using any more.

"Mr. Boyle: Will your Honor rule on my objection. The reason I didn't make this motion at the

time the great crowd of people were brought in and sworn in the presence of the jury was because I could not at that time properly have made it, because the answer would have been I could not anticipate what the State would use these witnesses for.''

''The Court: The witnesses were brought in at that time to be put in the witness room and were sworn. The court is not aware of any impropriety in the matter, and the motion will be overruled.

''To which ruling and action of the court the defendant then and there at the time duly excepted and still excepts.

''Mr. Boyle: I now ask your Honor to instruct the jury at this time, or advise the jury at this time, that the appearance of this great crowd of people and witnesses should not in any way influence them in this case.

''Mr. Jacobs: The State objects to anything of that kind because that is founded upon an impropriety and the court has said there was no impropriety.

''The Court: The court has no right to give such instruction verbally and the court will consider such written instruction if it is offered.''

During Mr. Curtin's argument on behalf of the State, the following occurred:

''Now note the difference between these two men, note the difference between these two men; note how they are regarded by the people in the community in which they lived; note the people that took the stand and told you that this defendant was a man who was not worthy of belief; note the men who came in here to tell you that you could not trust or believe this man because his reputation for morality was bad. And I want to tell you, gentlemen of the jury, when you attack the morality of a man you attack him in everything that is bad, because a man without good morals will commit any kind of crime; because a man without good morals will tell any kind of a story. You

saw these people come in here and they told you what they thought about him down there. As many were put on the stand as the State could put on over the objection of this defendant. We put them on until they stopped us. We brought them down there by the score to put them on and tell you what kind of man this man was and we put them on until they stopped us.

"Mr. Boyle (interrupting): I desire to make an objection to the statement of Mr. Curtin that he brought them down there by the score to testify, as a matter that is outside of this record and is not proper and is prejudicial.

"Mr. Curtin: I will withdraw that part of the statement, as long as the General objects to it, and I will say this, that we put them on until he stopped us. That is the difference between these two men."

Also the following:

"The kind of a man who kills is the man who goes about armed with deadly weapons of this kind and meets his victim and then shoots. The kind of man who kills is the man whose wife flees from him on account of his having a revolver in his possession. The kind of man who kills is the man—

"Mr. Boyle: Wait a minute. I want to take an exception to the statement of Mr. Curtin to the effect that the kind of man who shoots is the kind of a man whose wife flees from him on account of a revolver in his possession. I desire to object to that statement of counsel in the presence of the jury and I—

"Mr. Curtin (interrupting): I am referring to her own testimony yesterday afternoon on the stand, when Mr. Jacobs put the question to her about this trouble with him and she says, "I don't deny it."

"The Court: The court withdrew it.

"Mr. Jacobs: It was not with reference to the trouble between husband and wife, but it is on the question of whether or not the defendant was in the

practice of carrying a pistol, and it was an impeaching question, grounded upon her testimony that he wasn't in that practice, and she says she didn't deny it.

"Mr. Boyle: She didn't say she didn't deny it. She did not say that.

"The Court: The court withdrew from the consideration of the jury all controversy or quarrel between the defendant and his wife and if it refers to that it should be withdrawn.

"Mr. Curtin: That was what I was referring to, and I beg your Honor's pardon and I withdraw the statement.

"The Court: That is the instruction.

"Mr. Boyle: I want to note my exception to the language of counsel.

"The Court: What?

"Mr. Boyle: I want to except to the statement of Mr. Curtin when he made this statement before the jury; I want to make an exception to the statement of Mr. Jacobs when he says she admitted it on the stand; and I want to except to this thing and note it in the record, because you can't put poison in and take it out that way; I simply want to save my exceptions.

"The Court: Mr. Curtin has withdrawn it and it is not for the consideration of the jury under the instructions the court read you, so that you may proceed."

In the closing of Mr. Jacob's argument for the State, the following occurred:

"I want you to place the burden of it upon me when I ask you to convict this man and give him a sentence that will measure with the crime he has committed, for I say to you now, as I believe in the hereafter and as I reverence the Almighty God, I say to you now that I believe this man is guilty of cold blooded, premeditated murder, and so it is but one punishment, but one punishment that will measure the

crime he has committed, and place the responsibility
for that punishment upon me, I stand ready now to
bear it in the interest and in the right and in the name
of justice and in the name of protection to the people
of my country and of my city. Gentlemen, in consid-
ering this case—

"Mr. Boyle (interrupting) : Pardon me, I thought
you were about finished. I hate to interrupt you. I
want to save an exception to the statement of the
prosecutor that he believes the defendant guilty, and
that the jury can place the responsibility of their ac-
tion upon his shoulders, as being an improper state-
ment and one that is improper to make. I simply want
to save my exception to the remark and ask your Hon-
or to instruct the jury that that—

"Mr. Jacobs (interrupting) :  I withdraw the
statement.

"Mr. Boyle:  It is not a matter of argument but
an appeal to the feelings and passion of the jury on
a matter not evidentiary, and upon which he has no
right to so appeal. I make my exception.

"The Court:  He withdrew the statement.  The
jury will not consider it.  The jury are instructed not
to consider the remark.  It has been withdrawn by
the prosecutor.

"Mr. Boyle:  I save my exception.

On the first day of the April term, 1912, of the
criminal court of Jackson county, Judge Latshaw of
division one of that court filed a notice in writing to
Judge Porterfield of division two of said court to
open said division two, in compliance with section 2,
p. 210, Laws 1907.  On May 20, 1912, a change of venue
was granted in this cause to division two of the court.
The trial began on Monday the 27th of May and ended
on Saturday, June 1.  Judge Porterfield is the reg-
ular judge of division seven of the circuit court of
Jackson county.  While waiting for the parties to
make their challenges of the jurors, Judge Porter-

field finished the trial of a civil case in division seven of the circuit court, and it appears that at other times during the week of the trial he did some routine work in division seven, and presided in the juvenile court while the jury were considering their verdict. He was present in the trial of this case during the whole time actually spent in such trial.

I. In Samuels v. State, 3 Mo. 68, the trial was unfinished on Saturday. The following Monday was the day for the beginning of the Howard Circuit Court in the same circuit with Boone county where the trial occurred. The Boone Circuit Court was adjourned until the following Monday and a special term of that court was ordered for that day and the trial was finished accordingly. Objection was made to the validity of the conviction on the ground that the regular term provided by law for the Howard Circuit Court supplanted the term of the Boone Circuit Court. The court said: "If then, while the court was in session in Boone, the judge thereof deemed it expedient for the dispatch of business in that court to create a special term on Monday following, to be holden there, he had the power to do so, and he might by law send his order in writing to the sheriff of Howard, to adjourn that court to any day antecedent to the next regular term, and if the judge did so, there would be no interference. But whether this was done or not, it cannot judicially appear by this record. The judge, therefore, had it in his power by the act, to push the Howard court out of the way of holding court in Boone on Monday. We are, therefore, of opinion that it is the duty of the judge to arrange his special terms so as to give each county a due share of judicial time. And if this discretion is abused wantonly, surely it cannot be a cause for reversing the judgments of the court; but the judge would be answerable in person to the country."

**Jurisdiction.**

That case was cited and approved in Lewin v. Dille, 17 Mo. 64, and in State v. Pope, 110 Mo. App. l. c. 533.

The statute, providing for holding division two of the criminal court by the judge of division seven of the circuit court appears to be intended for relief in case of an overcrowded docket. [R. S. 1909, sec. 4221.] It provided that the judge of division seven of the circuit court, when notified, shall, with all convenient speed, open division two of the criminal court, but not until the case then on trial before him in the circuit court is concluded. It can be easily seen that Judge Porterfield can much more efficiently dispatch his business in the several courts over which he presides if he has the freedom of action which plain common sense would dictate in the matter. There is no showing here that he was overworked, and for that reason was not in condition to properly try this case. As he was alternating his labors in the three different courts, shall we hold that his work in the circuit court destroyed his jurisdiction in the criminal court, or that the holding of the criminal court destroyed the jurisdiction of the circuit court? Under the statute the latter result would be much more plausible than the first, but we do not think that either would be the case.

II. The fact that the mortal wound was in the head instead of the body was a mere matter of variance between the allegation and the proof which is cured by our statute as to variance (R. S. 1909, sec. 5114) and by the Statute of Jeofails. (R. S. 1909, sec. 5115).

*Variance.*

In State v. Anderson, 98 Mo. l. c. 472, it was said:

"The sufficiency of the indictment has been questioned; it alleges that the defendant gave the deceased, with the club aforesaid, one mortal wound on the *'head and body.'* This repugnant allegation, it is

254 Mo. 28

claimed, renders the indictment fatally defective. This contention would doubtless have prevailed at common law, but such objections are of no avail under our practice and statutory provisions. [State v. Edmundson, 64 Mo. 398; State v. Draper, 65 Mo. 335; R. S. 1879, sec. 1821.]''

The fact that the pistol was automatic, and not a revolver as alleged in the information, is a variance cured by the same statutes.

III. It is the duty of the court to see that no conviction shall stand which is the result of prejudice on the part of the jury. [State v. Prendible, 165 Mo. 329, and cases there cited.] That rule is nothing more than a restatement of the motto on our seal of State *"Salus populi suprema lex esto."* It makes no difference how regular the proceedings at the trial are, if prejudice finds its way into the verdict, that verdict cannot stand. Subordinate to that rule are other rules. One is that where prejudicial evidence is offered, but is excluded on the objection of defendant, the mere offer of such evidence is not reversible error. Ordinarily, if made in good faith, it is not error. When counsel for the State in argument to the jury make improper remarks, it is the rule that defendant's counsel must make objection thereto, and ask the court to rebuke the State's counsel, and save an exception to a failure of the court to do so. [State v. Wana, 245 Mo. 558.] Our whole system of jurisprudence is based on the theory that counsel in a cause know the law and the legal effect of the various things done by them at the trial. Counsel for the State must have known that it was not competent on cross-examination of the defendant to ask him about his cutting Arthur Pigg. True an objection to the question was sustained, and the trial court said as we say, "No defense for such a question as that." But the astute lawyer for the

*Margin note: Prejudicial Misconduct of State's Counsel.*

State had sunk his fangs deep in the lifeblood of the defendant—too deep for the poison to be withdrawn. The offense was multiplied when he asked of Ben Prock, "Don't you know he had trouble with countless men down there?" The court promptly sustained an objection. As in the first case, we presume that State's counsel knew that the objection would be sustained. He had an object in asking the question. It was asked on the theory that the sting would remain after the objection was sustained. He cannot find fault if we proceed on the same theory. Then came nearly a hundred men into the court room, who were sworn as witnesses for the State in rebuttal. After about six had testified to defendant's bad reputation, on objection the court declined to hear any more witnesses on that point, and the others of that large array were not placed on the stand. It is barely possible that those witnesses were called there in good faith, but it looks like an attempt to overawe the jury. The offense grew as it proceeded, for counsel for the State in his argument told the jury to note the people who came there to tell them that defendant's reputation was bad and said "we brought them here by the score and put them on to tell you what kind of man this man was and we put them on until they stopped us." On objection, that remark was withdrawn (?). He not only reminded the jury of the "crowd of witnesses," but he told them what their testimony would have been.

Again, without any testimony to support him, he alluded to the supposed fact that defendant's wife had fled from him on account of the revolver. An objection was sustained and the remark withdrawn, and the court told the jury not to consider it.

In closing the State's argument, counsel stated to the jury his solemn belief in defendant's guilt, though such act was condemned in State v. Hess, 240 Mo. l. c. 160, and in State v. Baker, 246 Mo. l. c. 376.

He even said to the jury, "I want to place the burden of it upon me when I ask you to convict this man and give him a sentence that will measure with the crime," etc. On objection, he withdrew it.

Now let us concede for present purposes that defendant was guilty of murder in the first degree. There rested upon the jury the duty of determining the punishment. That was the sole issue. His life was at stake. The killing was not done by passion nor "by lying in wait," nor in attempt to commit another felony. It even appears according to the State's evidence that the beginning of the "grudge" was the anger of Whitwell at being told not to hunt on the Webb land, resulting in a proposition from Whitwell to meet at the bridge and settle it.

Whether what followed that incident at the bridge was sufficient to entitle the defendant to the death penalty we are not now called upon to say. We merely assert that the facts are such that we cannot say that the misconduct of counsel was nonprejudicial, and are forced to the conclusion that it was prejudicial.

In State v. Spivey, 191 Mo. l. c. 112, counsel for the State was repeatedly cautioned by the court as to his misconduct, and repeatedly offended, so that the trial court was not derelict in its duty, and committed no error apparently, yet Judge Fox said that the only remedy in such a case is to set aside the verdict procured in that way.

Cicero, in the prosecution of Verres for corruption in office, discussed the subject of the duties of a prosecutor. He said, "Would you prosecute the wicked and cruel? Then beware lest in any respect you appear too hard and inhuman."

We appreciate the fact that it is easy to criticise officials for too much zeal in the discharge of their duties. An examination of the decisions of this court will reveal how loath it is to reverse because of mis-

conduct of counsel. Yet when the duty is plain, it must be done.

The judgment is reversed and the cause remanded. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.