THE STATE v. GUY MATHIS, Appellant.—18 S. W. (2d) 8.

Division Two, June 4, 1929.

*Wurdeman, Stevens & Hoester* for appellant.

*Stratton Shartel,* Attorney-General, and *Walter E. Sloat,* Special Assistant Attorney-General, for respondent.

WHITE, J.—From a conviction and a sentence in the Circuit Court of St. Louis County on a charge of felonious assault with intent to kill and malice aforethought, the defendant has appealed.

The victim of the alleged assault was the defendant's wife. He shot her, inflicting a very serious wound. Mathis conducted a sort of hotel and saloon at Prospect Hill in St. Louis County. The case for the State is entirely made out on the testimony of Dora Tucker and Benjamin F. Spicer, to whom Dora was married before the trial.

On January 14, 1928, about four o'clock in the afternoon, the defendant came into the saloon drunk and angry. Other persons there were drunk and disorderly. The evidence is somewhat confusing, but it sufficiently appears that the defendant endeavored to get rid of those disorderly people, finally got them out of the saloon, and fired three or four shots into the door and through the floor. Those shots were not directed at anybody. Just before that the defendant, according to the story of Spicer, pointed his gun at his wife and said he intended to shoot her, and she begged him not to; he told her he was going to shoot her and the bum together, possibly indicating his brother. That was about four o'clock in the afternoon. Mrs. Spicer testified that she heard the shots, but at that time she was in the basement in the kitchen. She also heard Mrs. Mathis say, "Shorty" (meaning Mathis), "don't shoot," but she didn't see him point his pistol at his wife.

Mathis went away, and, according to Dora Spicer, returned about six o'clock. He went down to the basement to the kitchen. Only himself, his wife and Dora were there. Mrs. Mathis asked the defendant if he wanted her to cook him a steak for supper. He said, No, he didn't want anything but action. He said, "Give me the steak and I will throw it to the damn dogs." He took the steak and threw it to the dogs. She then asked him if he wanted some coffee. He said he didn't want a thing. He called the names of some persons and said he had been following them. He didn't find them; it would have been too bad if he had. His anger seemed to be directed at persons other than his wife. He was standing by the stove. He took his gun from his pocket and "commenced pulling the trigger," and Dora saw the cylinder of the revolver going around. While he was doing that the revolver slipped over some way and was fired. Mrs. Spicer then described the incident thus:

"Well, he was just standing this way to the stove and she was right over there to the right of him, and he was just standing there with the gun this way and the first thing I knew it turned over that way and she was shot. I don't know how it was."

She did not stay to see what afterwards occurred, but immediately went up stairs. After the shot she heard Mrs. Mathis say, "Oh, Shorty!"

According to the undisputed testimony the defendant dropped his revolver, immediately picked up his wife, carried her up the stairs, put her in his Ford car and started to the hospital. On the way his gasoline gave out and he found someone with a car and took her to the hospital.

At the trial Mrs. Mathis swore that the shooting was entirely accidental. Defendant testified that he was cleaning his revolver and his wife corroborated that statement. He did not know that there was a cartridge in it, and the firing was accidental. He was drunk, nervous and agitated. On the State's theory he was pretending to clean his gun and shot his wife by changing the direction of the gun while he was snapping it, so that it appeared unintentional.

I. The defendant assigns error to the giving by the court of Instruction 6½:

"The court instructs the jury that the fact that defendant and his wife, Bertha Mathis, were on friendly terms immediately after the shooting mentioned in the evidence, and have remained so ever since, is no evidence of the innocence of the defendant, but if you believe from the evidence that, at the time the shooting took place, the defendant intended to kill said Bertha Mathis, with malice aforethought, or to do her great bodily harm, you should find the defendant guilty as charged in the information."

The court's attitude in respect to evidence of the character mentioned is shown when in cross-examination of Mrs. Spicer defendant's counsel asked her how the family got along prior to that time and she replied they "got along good;" that evidence was stricken out on motion of the State's attorney, and the jury instructed to disregard it. The exception to that ruling, however, was not preserved in the motion for new trial, but it shows the theory of the court, that evidence of the attitude of the defendant to the victim of the assault before and after the event was entirely incompetent, a theory directly contrary to the well-established rule that the conduct and the general demeanor of the accused after the crime and his attitude towards the object of the crime are not merely self-serving but always relevant. [16 C. J. 549 et seq.] The demeanor of a defendant in concealing his crime, his flight and other actions which tend to indicate his guilt, are always admissible. Likewise his actions indicating innocence are admissible. The State cites State v. Painter, 67 Mo. 84, 1. c. 87, in which an instruction similar to 6½ in this case was given, and apparently approved by this court. The ruling can hardly be said to be an approval of such an instruction, because the point was not presented to the court and the judgment was reversed on

other grounds. But if the court had there held directly that the instruction was not erroneous it would have been contrary to the uniform rulings of this court that the conduct of the defendant before and after the alleged crime is always admissible. It was for the jury to determine whether the defendant, in giving immediate attention to his wife's needs, although drunk as he was, taking her immediately to the hospital and showing all the solicitude for her welfare that an innocent husband would, was merely preparing for his defense.

Also this instruction is a comment upon the evidence. It directs the jury to pay no attention to certain significant facts. [State v. Shaffer, 253 Mo. 320, l. c. 337; State v. Edelen, 288 Mo. l. c. 172; State v. Cole, 263 S. W. l. c. 211.]

II. In the course of the argument of the prosecutor, Mr. Mueller, this occurred:

"MR. MUELLER: And so for that reason we do find out what the witnesses know, and when we find a witness like Mrs. Mathis, whom we know is perjuring herself, wouldn't it be folly to put on a perjuring witness, whom we know is telling an untruth.

"MR. HOESTER: I object to him making that statement to the jury and ask that he be reprimanded.

"MR. MUELLER: I withdraw it.

"THE COURT: I think you invited this in your argument."

The statement by the prosecutor that "we know Mrs. Mathis is perjuring herself," indicates that the prosecutor had knowledge of defendant's guilt aside from the evidence. Who could he mean by "we" unless the State and its officers? This was improper and prejudicial. [State v. Hart, 292 Mo. l. c. 97; State v. Seay, 282 Mo. l. c. 679.]

The prosecutor withdrew his statement but that did not remove the sting of the remark for the court nullified this withdrawal by saying that the defendant's attorney had invited it. Of course, if the defendant's counsel by his own argument invites an extravagant statement from the prosecutor, such statement may be excused, but we conceive of no situation, no argument by the defendant's attorney which would warrant the prosecutor in expressing his independent knowledge that a witness for defendant had committed perjury. Of course the trial judge has large discretion in determining whether a remark of that character would prejudice a defendant's case, but on another trial a recurrence of that incident should be prevented.

III.   After Mrs. Mathis was removed from the hospital to the home of her sister, one Rudolph Baumner, a deputy constable, came to see her.   The conversation he had with her was offered in rebuttal by the State.   He said she asked if there was any chance of her husband getting out of jail and he replied if someone went on his bond he would be released, and she said, "My God, don't let him out . . . I know if he gets out the first thing he does is to get drunk and come here and kill me."

In her cross-examination she was asked if she had made these statements to the constable and she said she had not made them. The introduction of that testimony is assigned as error.   If it was intended to show the relation of the defendant to his wife, whether friendly or otherwise, it was pure hearsay, entirely incompetent as evidence showing facts in connection with the case.   [State v. Wright, 319 Mo. 1. c. 51.]   It was further incompetent to impeach her, or for any purpose, because outside of her examination in chief.   [Sec. 4036, R. S. 1919.]   She was not asked about her relations with her husband after the shooting.   The prosecutor on cross-examination asked her if she was quite friendly with her husband *on the day* of the shooting.   But she was not asked at any time by the defense what attitude and relation existed between herself and her husband after the shooting.

The judgment is reversed and the cause remanded.   All concur.