THE STATE v. EDGAR E. CADE, Appellant.—34 S. W. (2d) 82.

Division Two, December 20, 1930.

*E. G. Robison* and *J. J. Robison* for appellant.

1134

*Stratton Shartel*, Attorney-General, and *G. C. Weatherby*, Assistant Attorney-General, for respondent.

WHITE, J.—The appeal is from a conviction, January 28, 1930, of murder in the first degree, and sentence to life imprisonment. The defendant was charged with murdering one Kenneth Hermann, December 31, 1929.

Defendant Cade at the time was forty-one years old. A few years before the incident he had married Nina Hermann, who had three children: Carl, nineteen years old; Kenneth, seventeen, and Albert, twelve. The defendant's father, eighty years of age, lived with the family at the time of the homicide.

On December 31, 1929, Kenneth Hermann was not well, ate no breakfast and did not go to school. Carl went to school as usual. About 2:30 in the afternoon of that day Mrs. Cade appeared at the house of one Anna Dice, about a quarter of a mile from the Cade home. She was very much excited and carried a rifle which belonged to her son Carl. Conversation which occurred between her and Mrs. Dice was not admitted. A short time afterward Carl Hermann at school received a message from his mother, and immediately went home. On his way he went by the home of Fred Warner and took Warner with him. He found Edgar Cade and Cade's father in the west room of the house, passed on through into the southeast room where he found his brother Kenneth still alive, but unconscious, with a bullet through his head. A doctor was called about 4:15 and examined the wound. On his advice the wounded boy was started to the hospital at St. Joseph and died on the way there. There was no eye-witness to the shooting except the defendant. All the facts in relation to the character of the crime must be gathered from circumstances and the defendant's own story.

I. The court instructed the jury on murder in the first degree, directing that if they found the defendant guilty of murder in the

first degree they should assess his punishment at life imprisonment. Why the judge excluded the death penalty from the consideration of the jury does not appear. The appellant assigns error to that instruction on the ground that the evidence did not authorize such an instruction. Where there is no witness to a homicide murder in the second degree is presumed in the absence of evidence to show the crime was of a different character. Murder in the first degree, however, may be.shown by circumstantial evidence. [State v. Lucas, 316 Mo. 1. c. 912; State v. Walker, 98 Mo. 107; State v. Grant, 76 Mo. 236.] Premeditation, thought of beforehand, and deliberation, the cool blood, may all be inferred from the circumstances of the homicide.

It appears from the record that a plat of the house and the furniture in the room where the homicide took place, was produced at the trial, but it is not in the record, and the evidence does not clearly explain the situation. When Carl Hermann came into the room Kenneth was lying on the floor on his back, breathing heavily, his feet entangled in the rockers of an overturned chair. The bullet wound was in the left side of his head. A pool of blood about the size of a saucer was under his head. The blood may have come from the wound or from his nose, which was bleeding. The blood was coagulated, indicating that some time had elapsed since the wound had been made. Carl picked up his brother to lay him on the couch and found blood under the pillow on the couch. How far the body lay from the couch it is difficult to ascertain, but it was a sufficient distance that Carl had. to "carry" the boy. The blood on the couch had been concealed and was discovered by pulling back the covers. A table stood in the room near where the body lay. There was blood on the table and under the table. According to Carl it looked as if it had been smeared there. The defendant was in the west room of the house and apparently had been in the house much of the time since the shooting.

According to defendant's story after he shot the boy he met his wife on the porch as he came out of the door and she took the rifle away from him. Immediately afterward she went over to the Dice house with the rifle. Defendant testified that he had had trouble with the boy and there was bad feeling between them; that right after dinner on that day he went into the house with the rifle which he had brought from the chicken house where it had been left, intending to place it up on a support of nails above the door. He was not tall enough to reach the place without a chair. He went into the room where Kenneth was sitting on a cot, reading a book. As defendant started to get the chair Kenneth jumped up, cursed the defendant, stepped over to the stove and reached for a poker, which, from defendant's description was a dangerous weapon, and when he did so defendant shot him, then ran out on the porch where his wife took

the rifle away from him. Further in his testimony he said the boy came to the stove from the cot after he was shot. According to the testimony of the physicians who examined the body the boy was incapable of moving except slight motions after the fatal shot was fired. These circumstances are sufficient to warrant the inference that there was careful preparation to conceal the character of the deed.

In his testimony defendant related a series of incidents that had occurred during a long period previous to the killing in which he claimed the boy had abused him, threatened him, and inflicted certain injuries upon him. The narrative showed that he maintained a very unfriendly attitude toward Kenneth. After he shot the boy he paid no further attention to him. Carl testified that after he placed Kenneth upon the cot he went into the room where the defendant was and asked him if he realized what he had done. The defendant replied, yes, he wished he had done it sooner. When the doctor advised taking the wounded boy to the hospital, defendant was asked for the keys to the car. He refused to give them up; said he did not have them. The sheriff was present at the time and he finally induced the defendant to give up the keys which he had hidden in his overshoe. At no time after the boy was shot did he show any regret for the deed, nor any consideration for the wounded boy. When he was in the custody of the sheriff something was said about his shooting the boy and he said: "You are God damn right I shot him."

Carl said to him in the presence of the sheriff: "Edgar, I am sorry you did this." Defendant replied: "I will settle with you later."

The bullet wound was an inch and a half above the boy's left ear, and one physician said about a quarter of an inch forward from that point. It ranged downward and forward and lodged just behind the inner corner of the left eye. The bullet traveled about two and one-fourth or two and one-half inches. Under these circumstances it was impossible for the boy to see the gun at the time it was fired or the man who held it. If he was shot while lying on the cot on his right side and his back toward the door, or lying on his back with his head slightly turned toward the wall, the bullet would take that course. The defendant made no explanation of how the body of the boy came to be tangled up with the rocking chair. It is a reasonable inference that the boy was shot while lying upon the couch and then taken to the place where the body was found and the conditions arranged so as to make it appear a case of self-defense. The arrangements must have been hurriedly made because the defendant failed to explain. He attempted to meet the evidence that the bullet entered somewhat from the rear by saying that the boy was stooping down to get the poker when he shot him. He does not attempt to explain how the boy went back to the cot after he was shot and then returned again to where he lay when found, for by his own story he ran out

of the room as soon as he fired the shot. Even if his story were reasonable the jury did not believe it.

All this evidence tends to show on the part of the defendant a fixed enmity against the boy; a careful preparation to conceal the character of his act, and self-satisfaction that he had accomplished the deed—circumstances sufficient to warrant the inference that the deed was premeditated and deliberate, and to authorize an instruction of murder in the first degree.

II. Appellant assigns error to admission by the court of certain evidence: (a) In permitting some of the State's witnesses—Warner. Carl Hermann, and others—to relate how the defendant refused to give up the keys to the automobile which he finally produced from his overshoe. The evidence was clearly admissible to show the defendant's attitude and behavior after the homicide.

(b) In permitting the prosecuting attorney to ask the defendant on cross-examination how he got home and was in the room where the deceased's body was, how he left the home of Anna Dice, how long after the shooting before he saw his wife, if he said anything to her after the shooting, where he went after he was at the Dice home, and his conversation with Hermann and Warner after the shooting, on the ground that he was not examined in chief about those matters.

As to many of these assignments no objection was made at the time. Others were entirely competent and permitted by the court because in further explanation of things he said in chief.

(c) In permitting a witness to tell that Mrs. Cade was greatly excited when she appeared at the Dice home immediately after the shooting.. The defendant stated in his own testimony that immediately after the shooting he went out on the porch where his wife took the gun away from him and that she went with that gun to the Dice home a quarter of a mile away. His own testimony indicates that she was excited about it and it was not harmful to him to have that stated.

III. In the course of the prosecutor's argument defendant's counsel objected in this form:

"I object to that statement, that if this man is turned loose there is going to be another killing."

The court then addressed the prosecuting attorney:

"You are trying him on this offense; confine yourself to it."

The defendant did not ask to have the prosecutor reprimanded nor to have the jury discharged or instructed to disregard the remark,

1140

nor ask any other relief in relation to that incident. The court cannot be convicted of error in failing to make a ruling which it had no opportunity to make.

IV. The appellant assigns error to the refusal of several instructions asked by him, one as to good character, one as to presumption of innocence, two relating to self-defense; each of which was covered by instructions given as favorable to defendant as he could desire, and all of which correctly declared the law.

V. Appellant assigns error to the giving of Instruction 4, defining manslaughter as the intentional killing of a human being, without malice aforethought, as those terms are hereinbefore explained or defined, and under circumstances that are not justifiable or excusable. The objection is that it should have told the jury that manslaughter is killing without deliberation, after defining deliberation as necessary to murder in the first degree. The jury could not have understood the instruction to mean that they could find the defendant guilty of manslaughter if deliberation existed. If they did the instruction was too favorable to the defendant and an error against the State because under the instruction on the appellant's theory they could have found the defendant guilty of manslaughter although the homicide was deliberate. The appellant, therefore, had no reason to complain.

It is further complained that the instruction does not define the word "excusable," "reasonable provocation," or "heat of passion." It is not necessary to define expressions in general use such as these. No explanation could make their meaning clearer.

It is further claimed that there was no evidence authorizing Instruction 4, or any other instruction, on manslaughter. In that case the defendant was not harmed and it was error against the State.

The court gave ample instruction on self-defense; although the appellant objects to the phrasing of such instruction, it accurately states the law.

It is complained that the instruction on murder in the second degree was erroneous because there was no evidence of premeditation and no evidence from which there could be an inference of premeditation. The evidence noted above amply shows circumstances from which the jury could properly infer premeditation.

Complaint is made of Instruction 18, telling the jury to take into consideration the defendant's good character, if proven to their rea-

sonable satisfaction. The objection is because the word "reputation" was not used instead of "character" as defendant had offered evidence only as to reputation. Section 4025 requires the court, whether requested or not, to instruct on all questions of law arising in the case, including the subject of good character, whenever necessary. It does not authorize an instruction on "reputation" unless that term may mean the same thing as "character" when the character of a witness is in issue. If the defendant's evidence upon "reputation" did not tend to prove good character, then there was no evidence to warrant an instruction on the subject and the error, if any, was favorable to the defendant.

Several other objections are urged against the instructions given by the court, all of which we find to be in form approved by this court.

VI. The appellant assigns error to the action of the court in permitting some of the witnesses to testify to statements made by the defendant at the time he was being taken from his home to the jail, that he made threats against the witness Carl Hermann and against Anna Dice and others. The demeanor of the defendant immediately after the crime which he is charged to have committed is always admissible for the purpose of showing his attitude.

We find no error in the record which was harmful to the defendant and the judgment is therefore affirmed. All concur.