THE STATE v. RALPH PIERSON, Appellant.—56 S. W. (2d) 120.

Division Two, December 14, 1932.

*Hay & Flanagan, John T. Hicks* and *William Baer* for appellant.

*Stratton Shartel,* Attorney-General, *Edward G. Robison,* Assistant Attorney-General, and *John L. Sullivan* for respondent.

FITZSIMMONS, C.—The grand jury of the city of St. Louis on April 4, 1930, returned an indictment against appellant, Ralph Pierson, and Lewis E. Balson, Andrew B. Meadows and Robert H. Cotham, jointly charging them with murder in the first degree committed on December 5, 1927, in the perpetration of an arson. The specifications of the charge were that the four accused men set fire to the Buckingham Hotel Annex, No. 4954 West Pine Boulevard, St. Louis, and that as a result May Frazer, a guest in the Annex, was burned to death. At the request of appellant, Pierson, he was granted a severance. Upon trial he was found guilty and his punishment was fixed at death. The motion for a new trial having been overruled, appellant was sentenced in accordance with the verdict. From this judgment he appealed to this court.

The testimony at the hearing upon appellant's application for a change of venue will be reviewed in the examination of the assignment of error predicated upon the refusal of the trial court to grant the change. The facts in this case pertinent to the fire, its origin and death of Miss Frazer, from burns and suffocation, in her room in the hotel are substantially the same as in State v. Meadows (Mo.), 51 S. W. (2d) 1033, decided by this court June 10, 1932. The de-

fendant there was tried under the same indictment for the death of Miss Frazer, as was appellant here. Miss Frazer was but one of several persons who lost their lives in the Buckingham Hotel fire. The gruesome narrative will be limited to the requirements of the questions raised by this appeal.

At the time of the fire in December, 1927, the Buckingham Realty Company, a corporation, owned the Buckingham Hotel and the Buckingham Hotel Annex at Kingshighway and West Pine Boulevards in St. Louis. The hotel proper was at the northeast corner and the annex at the southeast corner of these streets. Pine Boulevard separated them. The Annex consisted of two hotel buildings, each four stories high and joined by covered passageways at every floor. The building, which was burned and in which Miss Frazer was a guest was the easterly building of the Annex. All shares of stock of Buckingham Realty Company except one qualifying share were owned by Pierson and Balson, Pierson having the lesser holdings, and all their shares being pledged with a bank as collateral security for debt. At the time of the fire, December 5, 1927, the hotel properties of Buckingham Realty Company were in charge of Isaac T. Cook, as receiver, appointed June 29, 1927, by the United States District Court in St. Louis in an involuntary bankruptcy proceeding against the corporation. Substantial mortgages covered the hotel and the annex buildings and foreclosures were impending.

Andrew B. Meadows, defendant in the cited case and a witness against appellant here, was night watchman at the Annex from 1925 to the time of the fire. Robert Cotham was night clerk at the Buckingham proper during the same period. Cotham informed Meadows, one day shortly before the fire, that appellant Pierson had requested Cotham to see Meadows about burning the Annex and that Pierson had said that "if it is burned they will pay $10,000." After a few days consideration, Meadows informed Cotham that he would burn the hotel, but he demanded of Cotham $100 cash in advance. Cotham, before the fire, paid this sum to Meadows and after the fire he paid other sums in response to Meadows' demands, the total payments approximating $800. Meadows testified that in each instance Cotham informed him that he had received the money from appellant Pierson. One night after the fire, when Meadows called on Cotham, the two took a walk on Delmar Avenue, St. Louis, and met Pierson sitting in a parked automobile. After some conversation between Pierson and Cotham, the former handed to the latter a roll of bills bound with a rubber band. Meadows then said to Pierson: "When are you going to pay me so I can get settled down?" Pierson answered: "This is all I have got right now and we will try to fix you up later on." Meadows replied that he had to have car fare,

and Pierson gave Meadows $10. The roll of money which Pierson gave Cotham when examined was found to amount to $100, and this sum Cotham handed to Meadows.

Robert H. Cotham, night clerk at the Buckingham Hotel proper confirmed in the main Meadows' statements of payments approximating $800 by Cotham to Meadows and that he, Cotham, procured these sums from appellant Pierson. Cotham testified that, one night in November, 1927, Pierson made an appointment to meet Cotham the next morning at breakfast; that they met as agreed; that Pierson said he wanted Cotham to get some one to burn the Annex for the insurance to be gotten out of it, Pierson suggesting Meadows for the work; that Pierson agreed to pay ten per cent of the insurance collected; that he, Cotham, arranged with Meadows to start the fire; that Pierson told Cotham to inform Meadows the job would have to be completed before December 20th. Cotham further testified that at three o'clock on the morning of December 5, 1927, Meadows came through the hotel, passed the desk where Cotham was posting the books and he said: "Well, she's off;" that in about a minute or so the 'phone rang and the operator on the balcony told Cotham that a guest had phoned over and said that someone smelled smoke in room 227; that about that time the clerk at the Annex telephoned to Cotham to run over there quickly as there was a fire somewhere: that he ran across the street and assisted in awakening the guests in the Annex and later in taking care of those who escaped from the burning building. St. Louis firemen described the fire and testified to the finding of the body of Miss Frazer in the burned building. Each side, on the question of motive, gave evidence of the incumbrances on the hotel properties and the amounts of insurance on the building.

■■■ I. First, we will rule whether the trial court erred in denying appellant's application for a change of venue. Appellant offered in evidence copies of St. Louis newspapers, published in December, 1927, immediately after the fire, and containing displayed reports, illustrated by pictures, of the burning of the Buckingham Hotel and the loss of life. At that time no imputation of guilt attached to appellant or to his codefendants. Appellant also offered in evidence St. Louis newspapers, published three years later in 1930, reporting the arrest of the accused men and the purported confessions of certain of them. Appellant also called as witnesses twenty-four representative business and professional men, of long residence in St. Louis. Each testified in substance that he had heard from twenty-five to one hundred persons, express opinions that appellant was guilty. It was the view of these witnesses that there

was wide-spread prejudice against appellant. The State, in rebuttal, called twenty-five witnesses who had been subpoenaed for service as jurors in the criminal divisions of the Circuit Court in St. Louis, during the week preceding the hearing of the application for a change of venue. While substantially all these veniremen had read newspaper reports of the Buckingham Hotel fire and of the accusation of appellant, a large majority of them testified that they had not formed nor expressed an opinion concerning the guilt or innocence of appellant, and that, if they were jurors in the case, the fact that they had read the newspaper reports mentioned would not prevent them from trying the case according to the law and the evidence. The right of a defendant to have his case removed from the county or circuit in which it pends is purely statutory. [State v. Barrington, 198 Mo. 23, 95 S. W. 235, l. c. 255, and cases cited.] And while this court has ruled that when the defendant makes out a *prima facie* case, the change of venue should be awarded unless the prosecuting attorney avails himself of his privilege to rebut it (State v. Goddard, 146 Mo. 177, l. c. 182, 48 S. W. 821) yet, we have also ruled that when rebuttal evidence is offered the matter of granting a change of venue rests in the sound discretion of the trial court. [State v. Anderson, 252 Mo. 83, 158 S. W. 817, l. c. 822.] And since in the instant case, the State offered rebuttal evidence, we must invoke here to the full our settled policy that "it is only when the trial court plainly and palpably violates this discretion to such an extent as to preclude to a defendant a fair trial that this court will interfere." [State v. Anderson, supra.] It was observed in the Anderson case that no difficulty whatever was experienced in getting a jury. [158 S. W. 817, l. c. 822.] The record here shows that, in the examination of veniremen for the purpose of obtaining a panel of forty-seven men from whom the trial jury was chosen, only three were challenged for cause. We do not find that the trial court abused its discretion. This assignment therefore is ruled against appellant.

II. A series of assignments of prejudicial error are imputed to the cross-examination of appellant by the Assistant Circuit Attorney of the City of St. Louis, who represented the State in the trial of the case. It may aid us in examining this point to recall a few facts of the history of the law of evidence in criminal cases. Under the common law an accused person was not competent to testify in his own behalf, and this disability was not removed in England until 1898. Maine passed the first enabling act in 1864, and, today defendants in criminal cases are made competent by statute in all the states in the Union except perhaps one. It may

seem strange at this day that the delay of this reform was due more to considerations of justice than to a spirit of harshness toward accused persons. But Wigmore so tells us in his Treatise on the Anglo-American System of Evidence at Common Law (2 Ed.) Vol. I, sec. 579, p. 1008 in these words: "What was the reason for the general slow arrival at this measure? Not entirely a failure to perceive the fairness of giving the accused an opportunity to tell his story in exculpation. This fairness must have been appreciated as soon as any perception was reached of the impropriety of excluding parties and other interested persons. Indeed, before that time, it had become customary in England, to allow the accused to make a 'statement' to the jury, i. e. to tell his story, not on oath and not as a witness, but in the guise of an address or argument on the testimony and the whole case. A similar practice grew up or was introduced by statute in some of our own jurisdictions, and still obtains in Georgia. That the formal grant of competency, then, was so long withheld was due rather to a hesitation founded on the supposed interest of the accused himself. His failure to use the right of testifying would (it was believed) damage his cause more seriously than if he were able to claim that his silence was enforced by law. But, chiefly, his exercise of the right to testify would (it was believed), in subjecting him to the ordeal of cross-examination, place him in a situation in which even an innocent man would show at a disadvantage, and would injure more than assist his own cause."

The Twenty-ninth General Assembly of Missouri passed "an act to permit persons to testify in their own behalf in criminal causes," approved April 18, 1877 (Laws 1877, p. 356). The act made no mention of cross-examination, and, soon after it was passed, the question whether an accused person was subject to cross-examination was raised in the case of State v. Clinton, 67 Mo. 380, tried below in 1878, and, upon appeal, examined by this court in the same year. After a thorough review of the statute and of like statutes in other states and their construction, this court rightly ruled: "In the light, both of authority and reason, our opinion is that a defendant, who, at his own option, becomes a witness, under the Act of 1877, occupies the position of any other witness; is liable to be cross-examined as to any matter pertinent to the issue; may be contradicted and impeached as any other witness, and is to be subjected to the same tests." It thus appeared that the "ordeal of cross-examination," of defendants in criminal cases which for generations had been one of the causes of the continuity of their disability, was to be visited upon them. The next General Assembly, the Thirtieth, with the decision in State v. Clinton, supra, before it, in 1879 limited the liability of the accused to cross-examination "as to any matter referred to in

his examination in chief.'' The 1879 statute also for the first time enabled the wife or husband of the accused to testify for the defense and under the same restriction of their liability to cross-examination. [Sec. 1918, R. S. 1879.] And so the statute is today. [Sec. 3692, R. S. 1929.]

■ Transgression of the bounds of cross-examination by prosecutors has been charged in many cases appealed to this court since the restrictive proviso in 1879 was enacted. From these cases has come the settled rule that such examination of a defendant in violation of the limit set by Section 3692, Revised Statutes 1929, is not ground for reversal unless the cross-examination is on a material point or is prejudicial to the substantial rights of the defendant. [State v. Barrington, 198 Mo. 23, 95 S. W. 235, 1. c. 253, 254 and cases cited.]

With the aid of this perspective, we may examine appellant's complaint of prejudicial cross-examination. He was the last witness called by the defense and the last appearing in the trial. In answer to questions of his counsel, appellant, in his examination in chief, testified in substance as follows: He gave his name as Ralph Pierson, fifty-three years old, born in Burlington, Iowa. He lived in St. Louis for thirty-three years except for a period of six or seven years residence in Arkansas. About thirty-six or thirty-seven years before the trial, his family consisted of his father, mother, four sisters and a brother. At the time of the trial, his father was still living, and appellant's own immediate family consisted of a daughter eighteen years old. He also testified that in all his life, up to the time of the filing against him of the charge of complicity in the burning of the Buckingham Hotel, he had never been accused of any criminal offense against his city, state or country, and that he had never been arrested before. With this personal background before the jury, counsel for appellant asked him a series of questions pertaining to the charge and the testimony of the State's witnesses. Appellant, in answer to these questions, said that the charge of conspiracy to burn the hotel was ''utterly, infamously false.'' He never talked with Cotham, Meadows or Balson with a view to procure the burning of the hotel. He never paid nor promised to pay to Cotham or Meadows any money in consideration of the burning of the hotel, and he denied categorically the testimony of Cotham and Meadows as to the several specific conversations about the fire and the procurement of it, the money payments and the meetings of which we have made mention in our opening narrative. The foregoing is the substance of appellant's examination in chief.

■■■ One chapter or section of the assistant circuit attorney's cross-examination which appellant charges was not on ''any matter referred to in his examination in chief,'' is as follows: ''Q. MR.

PIERSON, you are a lawyer, are you not? A. Yes, sir. Q. A graduate of Washington University here in the city and a member of the bar? MR. HAY: I object as immaterial: THE COURT: Objection overruled. (Exception saved.) MR. SULLIVAN: Q. You are a graduate of Washington University? A. That is correct. Q. In fact, you graduated in the same class as Judge Franklin Miller, now Circuit Attorney of the City of St. Louis, did you not? MR. HAY: I object to the inquiry as not growing out of the direct examination. THE COURT: Objection overruled. (Exception saved.) MR. SULLIVAN: Q. Are you willing to go into this entire transaction, or are there some matters you would rather not discuss? MR. HAY: I object to the question and move that counsel be reprimanded for making such a statement as that. THE COURT: Objection and motion overruled. (Exception saved.) MR. SULLIVAN: Q. You stated that you were in the same class with Judge Miller, the Circuit Attorney? A. Yes, that is correct. Q. He is a friend of yours, so far as you know? You never had any controversy with him of any kind, did you? MR. HAY: I object as to not growing out of the direct examination and as being improper. THE COURT: Objection sustained. MR. HAY: And I ask that counsel be reprimanded and move a mistrial. THE COURT: Overruled.''

Honorable Franklin Miller to whom the prosecuting officer referred was at the time of trial, and at this writing he still is Circuit Attorney of St. Louis. The zealous prosecutor was one of several assistant circuit attorneys whom Mr. Miller was authorized by statute to appoint. [Sec. 11284, R. S. 1929.] And the duty of this assistant was ''to assist the circuit attorney generally in the conduct of his office under his direction and subject to his control.'' [Same section.] It was also the duty of the assistant attorney to do his part to procure for appellant a fair and impartial trial, to which the Constitution of Missouri entitled him.

The use which the Assistant Circuit Attorney made, in his address to the jury, of the quoted part of the cross-examination of appellant, is the subject of a separate assignment of error. But the highly prejudicial effect of the ''class-mate'' cross-examination may be demonstrated by what the prosecutor said of it in his argument. Here are his words: ''MR. SULLIVAN (continuing): Gentlemen of the jury, did this defendant Ralph Pierson do exactly as you would have done? Did he do what you would have done if you were innocent of this heinous offense; if evidence had been presented that would tend to prove you were innocent of this offense; if evidence had been presented, under the supervision of the one man in this world who could have prevented an indictment or criminal charge from growing out of it, gentlemen; of the one man in this world who could have come

into this court and entered a dismissal of the criminal charge that was pending? Gentlemen of the jury, Ralph Pierson did not do what you would have done. I submit to you as reasonable men that if you had been framed, in the language of the defense; if you had been the victim of a blackmail; if you were accused by the false testimony, by testimony that could be proved false, the thing that you would do, and the thing that you should do, besides consistently proclaiming your innocence, would have been to come to your friend, to have come to your class-mate and laid your cards on the table that time, thereby causing him to make an investigation and dismiss that charge against you if it were not true. MR. HAY: I object to those statements and ask that counsel be reprimanded and move for a mistrial because of the improper statements. THE COURT: Over-ruled.''

The large record bears much proof of the known skill of the assistant circuit attorney as a prosecutor. He shows himself to be a specialist in criminal court trials. Therefore his cross-examination of appellant and the quoted part of his address to the jury was all the more prejudicial because it clearly was not the work of a blunderer whose crudities become harmless. Rather it was like to the parry and thrust and, at the last, the deadly blow of the triumphant gladiator over a stricken opponent. It was a close case in this that it was the testimony of Cotham and Meadows, (the latter under sentence of death at the time,) against the denials of appellant. In this state of things the assistant circuit attorney brought out that appellant, a lawyer, had been a classmate of Circuit Attorney Miller, in whose name and by whose authority the assistant was acting at the time. And, in his address to the jury, he demonstrated the prejudicial effect of this improper cross-examination by marshaling as proof of appellant's guilt the fact that he was a classmate of the Circuit Attorney, ''the one man in this world who could have come into this court and entered a plea of dismissal of the criminal charge,'' and the further fact that appellant, beyond ''consistently proclaiming his innocence,'' did nothing to move Judge Miller to take this course. The law's presumption of appellant's innocence attended him throughout the trial. The burden of proof of Pierson's guilt was upon the State, and that burden could not lawfully be shifted or lightened by the prejudicial fact that Miller as Circuit Attorney had not seen fit to save Pierson from the perils of trial for his life.

One of the elements of the right of a defendant against liability to improper prejudicial cross-examination should be protection as well by the prosecuting officer as by the trial judge and defendant's attorney against the necessity of the assertion of that right before

the jury. Yet, in the cross-examination here under consideration, the prosecutor asked appellant: "Are you willing to go into this entire transaction or are there some matters you would rather not discuss?" And the trial court overruled the objection to that question. Section 3692, Revised Statutes 1929, gave to appellant the right to testify in his own behalf without liability to cross-examination on any matter not referred to in the examination in chief. Section 3693, Revised Statues 1929, buttressed this granted right with the further protection that if the accused should not avail himself of the right to testify, that fact should not be construed to affect his innocence or guilt, "nor be referred to by any attorney in the case." It was a right of appellant of equal sanctity that the assistant circuit attorney should not inquire of him in effect whether he wished to waive his statutory protection against improper cross-examination. It was primarily the duty of the attorney not to ask an improper question which could not but be construed to affect the guilt of appellant.

We are well aware of the solemnity of our decision in this case, and of its consequences. We cannot read without a shudder the harrowing details of the Buckingham Hotel fire and the loss of human lives caused thereby. This court affirmed the sentence of death of Meadows, a codefendant of appellant, and set July 15, 1932, as the date for the execution of Meadows. [State v. Meadows, 330 Mo. 1020, 51 S. W. (2d) 1033.] It is a matter of public knowledge that before the appointed day of atonement fixed for Meadows, the Governor of Missouri granted to him a reprieve until a day certain in February, 1933, in order that he might be alive to testify against Pierson if this court should grant to Pierson a new trial. In other words it may be that the day and perhaps even the fact of the capital punishment of Meadows turns upon the event of this appeal. But if Pierson is entitled to a new trial—and we hold he is—he gained that right by the abuse by the assistant circuit attorney of appellant's right to a fair and impartial trial in the first instance. And whenever a defendant is sentenced to prison or to death after a trial in which his right to an impartial trial is prejudiced we, upon appeal, as duty demands, will right the wrong done, whatever may be the consequences. We hold in this case, under a long line of decisions of this court, that the prejudicial and improper cross-examination of appellant was reversible error. [State v. Aurentz (Mo.), 263 S. W. 178; State v. Lasson, 292 Mo. 155, 238 S. W. 101; State v. Wellman, 253 Mo. l. c. 314, 161 S. W. 795; State v. Webb, 254 Mo. l. c. 434, 435, 162 S. W. 622; State v. Bowman, 272 Mo. 494, 199 S. W. 161, l. c. 164; State v. Goodwin, 271 Mo. 73, 195 S. W. 725; State v. Culpepper, 293 Mo. 249, 238 S. W. 801; State v. Sharp, 233 Mo.

269, 1. c. 286, 287, 135 S. W. 488; State v. Barri (Mo.), 199 S. W. 136, 1. c. 138; State v. Nicholson (Mo. App.), 7 S. W. (2d.) 375.] And this error was emphasized by the address of the assistant circuit attorney to the jury.

■ III. Other assignments of reversible error of the same nature as the one discussed in the preceding paragraph will be mentioned by way of caution for the next trial. On cross-examination the assistant circuit attorney inquired of appellant over objection about questions put to him by police officers while appellant was a prisoner at headquarters and about questions asked of Cotham by the police in appellant's presence and Cotham's answers. Appellant was cross-examined also about his refusal to testify, while he was a prisoner in the St. Louis city jail in a deposition which was being taken by attorneys for an insurance company in a civil action arising out of the Buckingham Hotel fire. These parts of appellant's cross-examination were upon matters not referred to in his examination in chief and were highly prejudicial. The skilled assistant circuit attorney who tried this case for the State knows well the rule that "our whole system of jurisprudence is based on the theory that counsel in a cause know the law and the legal effect of the various things done by them at the trial," as was said by this court in State v. Webb, 254 Mo. 1. c. 434, 435, 162 S. W. 628, by way of comment upon improper cross-examination. Upon another trial this knowledge should be a guide against the errors mentioned.

■ IV. Appellant assigns as error the following language used by the zealous assistant circuit attorney in his closing argument to the jury: "Knowing the responsibility I have to this community, knowing and acknowledging my responsibility to Almighty God, I say to you with all the emphasis of which I am capable that there is only one just punishment that can follow this evidence, and I say this to you with all my ability, I ask you to find this' defendant guilty and return the extreme penalty—death; and I say to you, with the knowledge that I have, that when you return that verdict in this court you may place that responsibility on my soul, and on my body, and I will carry it and gladly accept that responsibility, and relieve your shoulders of it."

This declamation was very improper. Its main offending is a profession of "the knowledge that I have" which created a fair inference that the advocate for the State knew more than had been offered in evidence. The State in its brief insists that, in view of numerous prior appeals of the assistant circuit attorney to the jury to be guided by the evidence, this later statement should be con-

strued to mean knowledge drawn from the evidence. But we do not so regard it. It is settled law that counsel, in their arguments, are not free to express their own opinions or private knowledge of the guilt of the defendant. And when they so express themselves, they are in peril of committing reversible error. In this case we are of opinion that the language of the assistant circuit attorney was a distinct ground for reversal. [State v. Webb, 254 Mo. 414, 162 S. W. 622; State v. Spivey, 191 Mo. 87, 90 S. W. 81; State v. Mathis, 323 Mo. 37, 18 S. W. (2d) 8; State v. Furgerson, 162 Mo. 668, 63 S. W. 101; State v. Goodwin (Mo.), 217 S. W. 264.]

V. The court gave of its own motion four instructions to the jury. It refused to give twelve instructions requested by appellant. We have examined the refused instructions. Most of them were adequately covered by the given instructions, and we find no reversible error in the refusal of the trial court to give any of them.

VI. For the prejudicial errors in the cross-examination of appellant and in the argument of the assistant circuit attorney the judgment of the court below is reversed and the cause is remanded for a new trial. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion, by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.