**STATE of Missouri, Respondent,**

v.

**Marvin Jack JONES, Jr., Appellant.**

**No. 9557.**

Missouri Court of Appeals,
Springfield District.

Jan. 9, 1975.

John C. Danforth, Atty. Gen., Robert M. Sommers, Asst. Atty. Gen., Jefferson City, for respondent.

John B. Newberry, Springfield, for appellant.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

BILLINGS, Chief Judge.

The 31-year-old defendant, Marvin Jack Jones, Jr., was convicted of murder in the first degree for the garrote slaying of his 46-year-old paramour, Edna Maybelle Rose, and the jury assessed his punishment

at life imprisonment. In this appeal the defendant attacks certain of the court's instructions, questions the qualifications of one of the state's witnesses, and challenges the *weight* of the evidence to support the verdict of the jury. We affirm.

Initially we note that it is not our appellate function or prerogative to weigh the evidence to determine whether the charge in a criminal case has been proven beyond a reasonable doubt; that is a function of the jury. State v. Strong, 484 S. W.2d 657 (Mo.1972); State v. Sherrill, 496 S.W.2d 321 (Mo.App.1973).

However, from an examination of defendant's unsuccessful motion for a new trial and the argument portion of his brief herein, we have concluded that it is the *sufficiency* of the evidence to support his conviction that the defendant is questioning. We will, therefore, overlook the inartful phrasing of defendant's point and consider the same relative to the sufficiency of the evidence.

We detail the evidence relied upon by the state to sustain the conviction, keeping in mind that it is those facts and circumstances and favorable inferences flowing therefrom which are most favorable to the state's position that are for our consideration and we disregard evidence and inferences to the contrary. State v. Strong, supra; State v. Sherrill, supra. With the foregoing principles as boundaries for our review of the sufficiency of the evidence, the jury could reasonably find the facts giving rise to the death of Edna Maybelle Rose as hereinafter set forth.

Defendant and Edna had been living together in her apartment for several months prior to January 16, 1973. Marriage had been discussed but not consummated and a week or so before her death Edna had suggested that defendant move out of the apartment until they were married. Defendant had acquiesced in this suggestion and had removed his personal belongings from the apartment and was living elsewhere at the time of the murder.

Edna Rose's apartment was the top floor of a two-story dwelling located near the intersection of Kansas and Division Streets in Springfield. The first floor apartment was occupied by Mildred Rodriquez and her ex-husband. Access to the second story apartment was by way of the front entrance hall and a stairway. The front bedroom of the Rodriquez apartment is located directly beneath the living room of the upstairs apartment and to one side of the bedroom where the victim's body was found.

On the night of January 16, 1973, Edna's son, Melvin Meads, and his girl friend, Sandra Louise Belle, were at his mother's apartment visiting. The defendant was there with Edna when Melvin and his friend arrived about 7 o'clock in the evening. Both Melvin and Sandra observed that the defendant was wearing a white crew-neck undershirt beneath his outer shirt. When Melvin and Sandra left the apartment about 8 o'clock, the defendant was still there.

Mildred Rodriquez was taking care of another's baby in her apartment that night and watching television. Her former husband arrived about 9:30 o'clock and retired to a bedroom located at the rear of the downstairs apartment. The show Mrs. Rodriquez was watching ended at approximately 12:15 a. m., January 17. She then went into the front bedroom to attend the baby and while doing so she heard "thumping" sounds and "whimpering" noises emanating from the upstairs apartment. "It sounded like a woman, kind of a girlish woman's sound," was the way Mrs. Rodriquez described the source of the "whimpering." The sound and noises heard by Mrs. Rodriquez continued for ten to fifteen minutes. There was a period of silence, followed by sounds from the Rose apartment of someone walking around and water running. Mrs. Rodriquez then heard someone walking down the steps of the stairway, "like heavy boots walking down the steps," and heard the door to the front of the dwelling being opened. She looked out her front window and saw the defendant walking towards his car. She knew the defendant and recognized his station wagon. Arc lights from the street intersection and other lighting in the area illuminated the scene and Mrs. Rodriquez saw the defendant enter the station wagon and drive away.

About two or three hours later Mrs. Rodriquez heard someone walk up the stairway, knock on the door of the upstairs apartment, and then descend the stairs. As the person left the dwelling Mrs. Rodriquez looked out her window and again saw the defendant.

Early the next morning Melvin Meads went to his mother's apartment to take her to a cafe where she was employed as a waitress. There was no response to his knock on the apartment door so he drove to the cafe to see if she was there. Edna Rose was not at the cafe but the defendant was there. Melvin asked the defendant if he had seen his mother and the defendant replied that he had not. At Melvin's request the defendant accompanied him back to the apartment to look for Mrs. Rose. The defendant was described by the son as "pretty nervous and was smoking cigarette right after cigarette" and was not wearing an undershirt.

Melvin and the defendant were unable to enter the upstairs apartment because the door was locked. Knocking on the door did not result in any response from within. The owner of the dwelling lived nearby and he was summoned to unlock the door. This was about 7:30 o'clock in the morning. When the door was unlocked,[1] Melvin started into the apartment first but was pushed back by the defendant who said "Let me go first." The defendant went straight to the bedroom normally occupied

1. The door was unlocked by the use of a skeleton key. Defendant admitted he had had a key to the door while he was living in the apartment. From the inside the door could also be locked by a bolt lock and chain lock, neither of which was engaged.

by Mrs. Rose. A blanket covered a figure on the bed. The defendant placed his hand òn the figure and said "Get up." There was no response. The defendant raised the blanket, looked and replaced the blanket. He "acted like he was crying" but witnesses did not observe any tears.

Officers were immediately summoned to the apartment. An examination of the dead woman revealed that she had been severely beaten and then strangled to death. There were several bone fractures in the facial and upper body areas.[2] Knotted around her neck was a black nylon apron she used in her work as a waitress. Her nightgown was askew and her underpants had been torn off. There was evidence of recent sexual intercourse. There was blood on the face and hands of the deceased, as well as on the sheet and small rug located near the bed. In the bathroom the officers found a man's white crew-neck undershirt which was stained with blood.

The defendant was taken into custody by officers at the scene of the killing. When he was booked at the police station all of his clothing, consisting of shirt, pants and socks, together with his boots, were removed by the authorities. Subsequent tests revealed bloodstains on the defendant's shirt, trousers and a rug fiber found on the toe of his right boot. Further testing of the undershirt found in the bathroom and the defendant's trousers demonstrated that the blood found on these items was of the same type as that of the dead woman. A test for blood made of the defendant's hands was positive.

When the defendant was initially questioned by police officers[3] on January 17th he stated he left Edna's apartment about 10 o'clock the evening before and had not returned. He said he had gone to a bar and had a sandwich and a beer and from there he went to a truck terminal where he·

spent the night. Later the same day the defendant asked to speak to one of the officers alone. He told the officer that after he had had a sandwich and beer at the bar he went to a second bar and consumed an additional four or five beers; that he had gone back to her [Edna Rose's] home and talked to her but could not remember what had happened; that he did not remember leaving the bar until he was at Edna Rose's apartment talking to her. The defendant then told the officer he wished he were dead and wished someone would shoot him. He asked the officer if it would be possible "to go before the judge and plead guilty without anyone in the courtroom." The next day, January 18, the defendant told officers that "he guessed he had killed Edna Rose and that after he had talked to his attorney he would tell us all about it, but his father was employing an attorney and he didn't wish to discuss it further."

The defendant took the stand in his own behalf and denied he beat or strangled Edna Rose. He testified he left her apartment about 10 o'clock in the evening of January 16 and never saw her alive again. He acknowledged that he returned to the apartment sometime after midnight but since there was no answer to his knock on the door he left and went to the truck terminal. He denied ownership of the bloody undershirt found in the bathroom of the apartment and had no explanation for the source of the bloodstains on his shirt, trousers, and the rug fiber on his boots.

■ In questioning the sufficiency of the evidence to sustain his conviction the defendant has narrowly limited his attack. He contends that the testimony of Mildred Rodriquez is the only evidence that placed him at the deceased's apartment when she was killed; that this testimony is the only probative evidence upon which the jury

---

2. Both orbits, the nose, sternum and ribs on both sides were broken. The face was bruised and lacerated. The autopsy surgeon said a fist, object, open hand or kicking could have

caused the injuries and the injuries were immediately followed by strangulation.

3. Miranda warnings were given defendant.

could have convicted him; and, that since it was "absolutely impossible" for witness Rodriquez to have seen him from her window, because of shrubbery in front of the window, her testimony is unbelievable and the case should not have been submitted to the jury.

The defendant's argument overlooks and ignores the testimony of both witness Rodriquez and her landlord that ice and snow had mashed and broken the shrubbery down. The contention likewise ignores the positive testimony of witness Rodriquez that she could and did see the defendant, whom she knew, leaving the dwelling shortly after she had heard the "thumping" sounds and "whimpering" noises from the Rose apartment. The weight to be given the challenged testimony of the witness was for the jury.

Defendant's point also fails to take into consideration other facts and circumstances in evidence. The bloodstains on the defendant's clothing were of the same blood type as that of the victim. The defendant was seen wearing a particular type undershirt in the deceased's apartment the night of the murder and a similar undershirt, stained with blood of the same grouping as the dead woman, was found in the apartment when the body was discovered—when the defendant was not wearing an undershirt. The uncontradicted and unexplained evidence of these bloodstains was likewise for the jury's consideration. State v. Ilgenfritz, 263 Mo. 615, 173 S.W. 1041, 1044 (1915); State v. Cole, 354 Mo. 181, 188 S.W.2d 43 (1945); State v. Beard, 16 N.J. 50, 106 A.2d 265 (1954); 40 C.J.S. Homicide § 248 (1944); 40 Am.Jur.2d, Homicide, § 413 (1968).

The defendant, shortly before the body of the slain woman was discovered, was "pretty nervous" and chain-smoking cigarettes. He shouldered his way in front of the deceased's son, entering the apartment first and going directly to the room where the body was located. He shed no tears upon seeing the brutally beaten, bloody and strangled body of the woman he professed to love and intended to marry. After first denying to officers he had returned to the apartment after leaving at 10 o'clock the evening before, he thereafter admitted he did return to the apartment and talk to Edna Rose. He inquired of the authorities if he could enter a plea of guilty to the killing without anyone else being present in the courtroom. And, he told the officers that after he had talked to the attorney his father was employing, he would tell the officers "all about it."

The aforesaid conduct, demeanor, appearance and statements of the defendant following the death of Edna Rose are factors the jury were entitled to consider as bearing on the defendant's guilt or innocence. State v. Cade, 326 Mo. 1132, 34 S.W.2d 82, 84 (1930); State v. Mathis, 323 Mo. 37, 18 S.W.2d 8, 9 (1929); 40 C.J.S. Homicide § 247 (1944); 40 Am.Jur.2d, Homicide, § 315 (1968). We hold the facts and circumstances detailed herein constituted sufficient substantial evidence to submit the case to the jury and the trial court did not commit error in overruling the defendant's motion for judgment of acquittal.

The state's verdict-directing instruction on first degree murder, instruction 6, and the instruction submitting second degree murder, instruction 7, are attacked by the defendant.

Instruction 6, after defining first degree murder, proceeded to define the terms "willfully", "deliberately", "premeditatedly", "malice", "malice aforethought", and "feloniously" and then followed with the verdict directing portion of the instruction. The defendant contends the inclusion of the definitions of these terms in the first degree murder verdict director unduly emphasized these terms and consequently confused and mislead the jury. His complaint in regard to instruction 7 is directed to this instruction first referring the jury to the definitions of the terms given in the previous instruction and then instructing on the necessary findings for second de-

gree murder. We gather from the defendant's argument that he is of the opinion that instruction 7 should have again defined all of the terms except for "deliberately".

This case was tried prior to January 1, 1974, the effective date of MAI–CR instructions. Thus the court was obligated and under a duty to define the aforesaid terms when used in the verdict-directing instruction. State v. Smart, 485 S.W.2d 90 (Mo.1972); State v. LaMance, 348 Mo. 484, 154 S.W.2d 110 (1941). The defendant makes no claim that instruction 6 misstates the law or misdirects the jury and furthermore, does not claim any of the terms were improperly defined. He has failed to demonstrate any prejudice or injustice by reason of the inclusion of the definitions in instruction 6, rather than defining them in a separate instruction. The point is denied.

Equally without merit is the defendant's challenge to instruction 7. His contention in this respect was foreclosed by the rejection of a similar objection voiced in State v. Young, 314 Mo. 612, 286 S.W. 29 (1926). In the latter case instruction 3 defined first degree murder and then defined the terms used in the first degree murder definition. Instruction 5 in that case was the second degree verdict director and referred the jury to the definitions of the various terms in instruction 3. In rejecting the defendant's contention the court, at p. 34, said: "It is not claimed that instruction 3 *improperly* defines 'wilfully,' 'deliberately,' etc., nor is it charged, that said instruction does not properly define murder in the first degree. Instruction 5 is complained of because it *refers* to instruction 3, for a *proper* definition of 'willfully,' 'premeditatedly,' etc. What difference could it make to defendant, whether the instruction 5 *called* for a proper definition of said terms as defined in another instruction, or whether the definition of said terms was properly *set out* in said instruction 5? It is manifest that if instruction 5 had properly defined the above terms without refer-

ring to instruction 3, it would have been a valid instruction on murder in the second degree. It is no less valid by reason of its reference to instruction 3 for a correct definition of above terms."

The defendant has also· sought to question instruction 5 given by the court which is as follows:

"INSTRUCTION NO. 5

"The defendant is presumed to be innocent.

"The fact that the defendant has been charged with an offense is not evidence against him. It creates no inference that any offense was committed or that the defendant is guilty.

"The state has·the burden of proving the guilt of the defendant beyond a reasonable doubt."

■ We first observe that the defendant concedes no complaint of instruction 5 was made in his motion for new trial. The point is not preserved for our review and since there is no showing that a manifest injustice resulted from the giving of the instruction, the plain error rule is not applicable. State v. Meiers, 412 S.W.2d 478 (Mo.1967). Nevertheless, we will briefly consider the defendant's twofold position that (a) the court failed to instruct the jury as to the state's burden of proof and (b) the instruction was not a proper burden of proof instruction since it allowed the jury to determine what a reasonable doubt was for itself.

■ Prior to January 1, 1974, and MAI–CR instructions, the law of Missouri was that a burden of proof instruction in a criminal case was not rendered erroneous by the omission therefrom of a specific statement that the burden of proof is on the state, provided the hypotheses of "presumption of innocence" and "reasonable doubt" are clearly stated. State v. Wilfong, 438 S.W.2d 265 (Mo.1969), cert. denied, 396 U.S. 995, 90 S.Ct. 496, 24 L.Ed.2d

460 (1969). Also prior to the effective date of the approved pattern criminal instructions it was not error to fail to define "reasonable doubt" ["Reasonable doubt is reasonable doubt, and that is about all that can be said in regard to it." State v. Talmage, 107 Mo. 543, 17 S.W. 990, 991 (1891)]. State v. Lafferty, 416 S.W.2d 157, 161 (Mo.1967). MAI–CR 2.20 does not attempt to define "reasonable doubt" and the Notes on Use state "No other instruction may be given elaborating further upon or attempting to define the presumption of innocence or reasonable doubt." In instruction 5 the jury was told "The state has the burden of proving the guilt of the defendant beyond a reasonable doubt." This is a proper statement of the law both before and after the adoption of MAI–CR and its inclusion in the instruction containing the presumption of defendant's innocence does not render it improper—as evidenced by both subject matters now being contained in MAI–CR 2.20.

This leaves for disposition the defendant's remaining point that the admission of testimony of state's witness Donald E. Smith "about blood and fiber identification and other matters concerned with the time that blood might congeal or how old blood stains might be over the objections" was error by reason of Smith's lack of qualifications as an expert.

■■■ We start with the rule that the qualification of an expert and the question of whether expert opinion upon the particular subject matter should be permitted are questions which are for the trial court's determination in the exercise of sound discretion. State v. Stevens, 467 S.W.2d 10, 50 A.L.R.3d 96 (Mo.1971), cert. den., 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971); State v. Vineyard, 497 S.W.2d 821 (Mo.App.1973). Our review is limited to the issue of an abuse of discretion by the trial court and we are not to reverse unless the error, if error exits, is shown to be prejudicial. State v. Vineyard, supra, 497 S.W.2d at 828.

■■■ The record shows that Mr. Smith was educated and experienced in the field of chemistry and laboratory analysis and that he had been employed since April of 1971 as Crime Laboratory Director for the Springfield, Missouri, Police Department. His duties in this position were to receive evidence, including blood and clothing samples submitted by law enforcement agencies within a region consisting of ten counties, to analyze the particular evidence, and if necessary to testify as to his findings in courts. His prior experiences included classification, analysis and comparison of blood samples and, the clotting and congealing of blood.

■■■ The record reflects that Mr. Smith testified, *without objection,* as to his examination and findings concerning the various bloodstained articles. Thus, defendant's complaint as to this testimony is not preserved for review. State v. Halbrook, 502 S.W.2d 439 (Mo.App.1973); State v. Vineyard, supra. On the matter of blood clotting and congealing the transcript discloses that the court sustained various objections to such testimony until further qualifications of the witness were shown and then ruled the witness was qualified. We find sufficient special knowledge in the witness to qualify him as an expert. We find no abuse of discretion and the point is denied.

The information is sufficient in form and substance. The verdict is in proper form and responsive to the information and issues submitted. Allocution was granted and the sentence and judgment are proper and responsive to the verdict.

The judgment is affirmed.

All concur.